CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 25 2022

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
         DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# DANVILLE DIVISION

|  |  |
|---|---|
| DEBORAH McKAGUE,<br><br>      *Plaintiff*,<br><br>v.<br><br>HSCGP, LLC f/k/a Life Point CSGP, LLC;<br>and DANVILLE REGIONAL MEDICAL<br>CENTER, LLC, d/b/a<br>SOVAH HEALTH - DANVILLE,<br><br>      *Defendants*. | **Civil Action No.:** 4:22CV00018<br><br><br>**COMPLAINT** |

Plaintiff Deborah McKague ("Plaintiff), by and through her undersigned counsel, Eisenberg & Baum, LLP and disAbility Law Center of Virginia, hereby states her Complaint against defendants HSCGP, LLC f/k/a Life Point CSGP, LLC and Danville Regional Medical Center, LLC d/b/a Sovah Health - Danville ("Defendants") as follows based upon personal knowledge and information and belief:

## INTRODUCTION

1. Language is the cornerstone of the patient-physician relationship. Indeed, "it is primarily through language that the physician works to establish rapport and trust. Good physician-patient communication is fundamental to good health care." E. McEwen & H. Anton-Culver, Journal of Family Practice, Vol. 26, No. 3:289–291, 291 (1988). Effective communication between medical providers and patients provides better patient safety, treatment, and health care outcomes.

2. As a deaf American, Plaintiff Deborah McKague communicates primarily in American Sign Language ("ASL"). As such, she requires an ASL interpreter to effectively communicate and participate in a medical setting.

3. Plaintiff visited Defendants' hospital for various reasons from 2018 to 2021.

Plaintiff herself was the patient during most of the visits at issue. At other times, Plaintiff visited the hospital as a companion to her husband Frederick McKague.[1]

4.      Before and during these visits, Plaintiff repeatedly requested in-person ASL interpreters and ASL interpreters via Video Remote Interpreting ("VRI") services to fully understand and participate in her care. VRI is "an interpreting service that [must] use[] video conference technology over dedicated lines or wireless technology offering high-speed, wide-bandwidth video connection that delivers high-quality video images."  28 C.F.R. § 36.104.

5.      Defendants consistently failed to provide Plaintiff with ASL interpreters despite knowing that Plaintiff is deaf and requested interpreters, preventing Plaintiff from enjoying the same services that a hearing person would.

6.      Without equally effective communication, Plaintiff could not make informed health care choices. Instead, she experienced heightened anxiety throughout her treatment. Defendants' actions and inactions caused her to be anxious and afraid of misunderstanding her treatment options and care. This was especially true given Plaintiff's vulnerable mental state.

7.      Thus, Defendants discriminated against Plaintiff by refusing to provide the ASL

---

[1] Federal regulations expressly adopted by Section 1557 of the Patient Protection and Affordable Care Act ("ACA") provide that a covered "entity shall furnish appropriate auxiliary aids and services when necessary to afford individuals with disabilities, including applicants, participants, *companions*, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of [the] entity." 28 C.F.R. § 35.160(b), *cited by* 45 C.F.R. § 92.102(a) (emphasis added). Moreover, regulations implementing Title III of the Americans with Disabilities Act ("ADA") extend a cause of action to "companions who are individuals with disabilities" for a covered entity's failure to furnish auxiliary aids and services to provide effective communication. 28 C.F.R. § 36.303(c)(1). This regulation defines "companion" to include "a family member, friend, or associate of an individual seeking access to, or participating in, the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation, who, along with such individual, is an appropriate person with whom the public accommodation should communicate." 28 C.F.R. § 36.303(c)(1)(i). Because the same substantive legal standards govern ADA, Rehabilitation Act, and ACA disability discrimination claims, Plaintiff may bring companion claims pursuant to both 45 C.F.R. § 92.102(a) and 28 C.F.R. § 35.160(b). *See, e.g., Bax v. Doctors Med. Ctr. of Modesto, Inc.*, 393 F. Supp. 3d 1000, 1017–18 (E.D. Cal. July 2, 2019) (refusing to dismiss companion-based ADA, Rehabilitation Act, and ACA claims that were sufficiently pled and noting that "the same legal standards govern plaintiff's claims brought either as patients in their own right or as companions to each other").

interpreters that she required to understand and participate in her health care.

8.    Based on Plaintiff's experience, it is also evident that Defendants have failed to implement policies, procedures, and practices respecting the civil rights and communication needs of deaf individuals. Plaintiff brings this lawsuit to compel Defendants to cease their unlawful discriminatory practices and implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity for deaf individuals to participate in and benefit from Defendants' health care services.

9.    Plaintiff brings this action seeking non-economic nominal and compensatory damages, injunctive and declaratory relief, and attorneys' fees and costs to redress Defendant's unlawful discrimination against her on the basis of her disability in violation of Section 1557 of the ACA, 42 U.S.C. § 18116.

## THE PARTIES

10.    Plaintiff is a resident of the independent city of Danville, Virginia, who is substantially limited in the major life activities of hearing and speaking. Thus, she is a qualified individual with a "disability" within the meaning of federal civil rights laws.

11.    Upon information and belief, defendant HSCGP, LLC f/k/a Life Point CSGP, LLC ("HSCGP") has at all relevant times been a limited liability company authorized to do business in the state of Virginia, with a registered address for service at c/o C T Corporation System, 4701 Cox Road Suite 285, Glen Allen, VA, 23060 - 6808, a principal place of business of 103 Powell Court, Suite 200, Brentwood, TN 37027. Upon information and belief, HSCGP is a parent company, owner, operator, and/or lessor of defendant Danville Regional Medical Center, LLC d/b/a Sovah Health - Danville and receives and accepts federal financial assistance, including but not limited to Medicare and/or Medicaid reimbursements.

12.     Upon information and belief, defendant Danville Regional Medical Center, LLC d/b/a Sovah Health - Danville ("Sovah Health - Danville" or "the Hospital") has at all relevant times been a limited liability company authorized to do business within the State of Virginia, with a registered address for service at c/o C T Corporation System, 4701 Cox Road Suite 285, Glen Allen, VA, 23060 - 6808, a principal place of business of 103 Powell Court, Suite 200, Brentwood, TN 37027, and maintaining its hospital at 142 South Main Street, Danville, VA 24541. Upon information and belief, Sovah Health - Danville receives and accepts federal financial assistance, including but not limited to Medicare and/or Medicaid reimbursements.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside within in this District and because the conduct giving rise to this Complaint occurred in this District.

## STATEMENT OF FACTS

15.     Plaintiff Deborah McKague is profoundly deaf, and her primary and most effective means of communication is ASL.

16.     Lip reading is the ability to understand the speech of another by watching the speaker's lips. It is no substitute for direct communication through a qualified sign language interpreter because many mouth movements appear identical on the lips.

17.     What is more, even if a primary ASL user were able to determine the sounds appearing on a speaker's lips, he or she would still not necessarily understand the English language because English and ASL are distinct languages with different grammatical structures. As another

example, ASL and French Sign Language are also distinct languages. Written notes are not effective for people who communicate using ASL for the same reason.

18.    Plaintiff cannot effectively communicate by reading a person's lips. This is especially true for communications involving complex medical terminology while Plaintiff was in a vulnerable mental state, and is compounded by the fact that medical staff were wearing facemasks at all relevant times due to the ongoing COVID-19 pandemic.

**Background**

19.    Sovah Health - Danville is the only hospital with an emergency room in the city of Danville, VA. As such, residents of Danville have little choice but to visit the Hospital in the case of a medical emergency. The next closest emergency room is a hospital in Martinsville, Virginia, which is also owned and/or operated by Defendants and/or their affiliates.

20.    Accordingly, Plaintiff and her husband have made numerous visits to the Hospital in the past, at which Plaintiff frequently encountered issues with the Hospital's refusal to provide the ASL interpreters that Plaintiff requests and requires to understand her and her husband's medical care.

21.    For example, Plaintiff's husband visited the emergency room at the Hospital (then-named Danville Regional Medical Center) on March 28, 2015, and the Hospital refused to provide Plaintiff the sign language interpreter she requested as her husband's companion. The Hospital acknowledged this failure in a letter to Plaintiff's husband dated April 13, 2015, in which the Hospital noted that "we sincerely apologize that you were not provided an interpreter during your visit," and stating that "[r]e-education has occurred with the Emergency Department staff and the hospital as a whole on the expectation of providing our patients with the services they need in order for them to understand their care."

22.     Plaintiff's claims in the instant lawsuit arise from Plaintiff's and her husband's numerous visits to Defendants' Hospital between 2018 and 2021 for a variety of health issues.

23.     Despite the Hospital's apology and assurances in 2015, the Hospital refused to provide the ASL interpreters Plaintiff requested and required during these visits.

24.     As such, Plaintiff was unable to meaningfully understand and participate in her medical care, was unable to effectively communicate with Hospital staff, and was treated differently by the Hospital than hearing patients are.

**March 11 and 20, 2018**

25.     On or about March 11, 2018, Plaintiff visited the Hospital for an insect bite on her right foot. Plaintiff was not provided any interpretive services during this visit.

26.     On or about March 20, 2018, Plaintiff returned to the Hospital after the insect bite worsened. Plaintiff was not provided any interpretive services during this visit.

**November 28, 2018**

27.     On or about November 28, 2018, Plaintiff accompanied her husband Frederick to the Hospital after he experienced chest pains. Plaintiff was not provided any interpretive services during this visit.

**March 18, 2019**

28.     On or about March 18, 2019, Plaintiff visited the Hospital after experiencing sharp chest pains. Plaintiff was not provided any interpretive services during this visit.

**July 8, 2019**

29.     On or about July 8, 2019, Plaintiff visited the Hospital after having an allergic reaction to her prescription medication.

30.     The Hospital attempted to communicate with Plaintiff through VRI that did not work, had poor video quality, frequently froze and disconnected, and was not an effective means of communication for Plaintiff. Plaintiff was not provided any other interpretive services during this visit.

**July 15, 2019**

31.     On or about July 15, 2019, Plaintiff visited the Hospital after feeling dizzy and experiencing severe headache.

32.     The Hospital attempted to communicate with Plaintiff through VRI that did not work, had poor video quality, frequently froze and disconnected, and was not an effective means of communication for Plaintiff. Plaintiff was not provided any other interpretive services during this visit.

**October 3, 2019**

33.     On or about October 3, 2019, Plaintiff visited the Hospital after an anxiety attack. Plaintiff was not provided any interpretive services during this visit.

**October 28, 2019**

34.     On or about October 28, 2019, Plaintiff visited the Hospital after an anxiety attack.

35.     The Hospital attempted to communicate with Plaintiff through VRI that did not work, had poor video quality, frequently froze and disconnected, and was not an effective means of communication for Plaintiff. Plaintiff was not provided any other interpretive services during this visit.

**November 15, 2019**

36.     On or about November 15, 2019, Plaintiff visited the Hospital after experiencing severe neck pain.

37.     The Hospital attempted to communicate with Plaintiff through VRI that did not work, had poor video quality, frequently froze and disconnected, and was not an effective means of communication for Plaintiff. Plaintiff was not provided any other interpretive services during this visit.

**February 29, 2020**

38.     On or about February 29, 2020, Plaintiff visited the Hospital after breaking her toe.

39.     The Hospital attempted to communicate with Plaintiff through VRI that did not work, had poor video quality, frequently froze and disconnected, and was not an effective means of communication for Plaintiff. Plaintiff was not provided any other interpretive services during this visit.

**July 6, 2020**

40.     On or about July 6, 2020, Plaintiff's husband brought her to the Hospital's emergency room after experiencing severe neck pain.

41.     Upon arriving, Plaintiff informed Hospital staff member via handwritten note that she is deaf, and requested the use of VRI for her visit from the staff member, who ignored the request and told Plaintiff to wait.

42.     After about 30 minutes of waiting (and being unable to hear her name called), Plaintiff was brought into a room to be evaluated by doctors and nurses. After waiting an additional ten to fifteen minutes, it became clear that Plaintiff would not be provided VRI or any other interpretive or auxiliary aid.

43.     Instead, in order to understand and participate in her own health care treatment, Plaintiff had to utilize an app on her phone called "Jeenie," which provides sign language interpreters by video at a cost of $1.00 per minute to Plaintiff.

44.     Plaintiff used this "Jeenie" app to communicate with doctors, nurses, and other of Defendants' staff until the end of her visit. At no point was Plaintiff provided with any auxiliary aid, including the VRI she requested upon her arrival at the ER.

**July 19, 2020**

45.     On or about July 6, 2020, Plaintiff called 911 through video relay service and explained that she was experiencing severe chest pain.

46.     Accordingly, Plaintiff was brought to the Hospital's ER by ambulance that same day. Plaintiff advised the ambulance staff that she is deaf, and requested that they notify the Hospital's ER that Plaintiff would need to be provided VRI for her visit.

47.     After arriving at the ER, Plaintiff reiterated to a Hospital staff member via handwritten note that she is deaf, and reiterated her request for VRI to the staff member, who ignored the request and told Plaintiff to wait.

48.     At no point during this visit was Plaintiff provided with any auxiliary aid, including the VRI she requested. Instead, she had to write notes back and forth with her doctor regarding her symptoms and care.

49.     After having an EKG test and having her blood drawn, Plaintiff was discharged after about an hour with a recommendation to see a cardiologist, but not fully understanding her diagnosis, treatment, or plan of care.

**October 13, 2020**

50.     On or about October 13, 2020, Plaintiff called the Hospital via video relay service over concerns about an infection from a skin graft on her finger that she had recently undergone to treat basal cell skin cancer. The doctor she spoke to advised her to go to the emergency room.

51.     Upon arriving, Plaintiff wrote a note to staff stating that her doctor told her to come in, and repeating her request for VRI for her visit.

52.     Once again, staff ignored this request, and Plaintiff was without an interpreter or any other auxiliary aid for her emergency room visit.

**October 28 – October 30, 2020**

53.     On or about October 28, 2020, Plaintiff went to the Hospital's emergency room after experiencing urgent symptoms relating to her mental health.

54.     Plaintiff's medical records from these dates of service note that "[t]he patient's primary language is ASL, [t]he patient's preferred language is ASL . . . [p]atient is hearing impaired."

55.     During this visit, Plaintiff was not provided with an ASL interpreter despite repeated requests, with the exception of a single appointment with a psychiatrist that used VRI on October 28. However, the VRI at that appointment was unreliable and did not have a steady view of the video, which resulted in Plaintiff being unable to understand the psychiatrist. The psychologist gave Plaintiff a medicine whose instructions and side effects she was unable to fully understand.

56.     Plaintiff noted her frustration with the VRI to Hospital staff by shaking her head and waving her arms, which was the only method Plaintiff had at that time to communicate.

57.     During this limited use of malfunctioning VRI on October 28, 2020, the device's connection and image were so poor that Plaintiff was unable to understand the ASL interpretation of a document staff wanted her to sign, which she later came to find out was a document admitting herself to the psychiatric ward. Plaintiff would not have signed the document had she been properly informed of its contents.

58.    Accordingly, Plaintiff was admitted to the Hospital's psychiatric ward where she remained until October 30, 2020.

59.    After (1) having an adverse reaction to the new medication she was given by the psychiatrist, (2) realizing that the Hospital would be unable to treat her issues without providing her a means to effectively communicate, and (3) realizing that she inadvertently admitted herself to the Hospital, Plaintiff requested that she be discharged as soon as possible.

60.    At another appointment with a psychologist, Plaintiff noticed that there was what appeared to be VRI equipment in the room. Plaintiff pointed to the VRI equipment, requesting again to attempt to use VRI absent any other auxiliary communication aid. However, the psychologist she was meeting with brushed off Plaintiff's request and indicated that she instead needed to write notes with the psychologist. Plaintiff, feeling vulnerable and confused, was not able to effectively share her feelings, symptoms, fears, and important information regarding her mental health through writing in English, her secondary language. Plaintiff also did not have access to a telephone, video relay service, or television while on the ward.

61.    Accordingly, Plaintiff was completely unable to effectively communicate with staff or anyone else during her two-day stay in the psychiatric ward, and the resulting isolation and alienation only exacerbated Plaintiff's mental health issues.

**July 12, 2021**

62.    On or about July 12, 2021, Plaintiff returned to the Hospital after feeling dizzy.

63.    Despite the Hospital indisputably knowing that she was deaf and required an ASL interpreter from past visits, Plaintiff was not provided any interpretive services during this visit.

**July 29, 2021**

64.     On or about July 29, 2021, Plaintiff's husband was brought by ambulance to the Hospital's emergency room after experiencing severe chest pains.

65.     After Plaintiff arrived at the Hospital to accompany her husband, the Hospital attempted to communicate with her through VRI that did not work, had poor video quality, frequently froze and disconnected, and was not an effective means of communication for Plaintiff.

66.     In one handwritten note to a nurse at 10:34a.m., Plaintiff wrote "I need to speak to [a] supervisor now please, video remote interpreter device keeps giving poor video quality."

67.     In response, the nurse wrote "I apologize for the technical difficulties. I will call the supervisor on call but this is all we have access to right now."

68.     Accordingly, Plaintiff did not have any effective interpretive services during this visit.

**July 30 – August 2, 2021**

69.     On or about July 30, 2021, Plaintiff and her husband returned to the Hospital after Mr. McKague experienced ongoing health issues. Mr. McKague remained at the Hospital until on or about August 4, 2021.

70.     Plaintiff accompanied her husband at all relevant times during his stay.

71.     Here, Defendants provided in-person interpreters but only on a very limited and spotty basis, and again attempted to use VRI that did not function properly.

**September 5, 2021**

72.     On or about September 5, 2021, Plaintiff was brought by ambulance to the Hospital for symptoms relating to kidney stones. The Hospital attempted to communicate with Plaintiff through VRI that did not work, had poor video quality, frequently froze and disconnected, and was

not an effective means of communication for Plaintiff. Plaintiff was not provided any other interpretive services during this visit.

**September 13, 2021**

73.     On or about September 13, 2021, Plaintiff's husband returned to the Hospital after experiencing severe and simultaneous leg pain and nosebleed. Plaintiff accompanied her husband but was not provided any interpretive services during this visit.

**October 3, 2021**

74.     On or about October 3, 2021, Plaintiff visited the Hospital after experiencing abdominal pain relating to acute diverticulitis. The Hospital attempted to communicate with Plaintiff through VRI that did not work, had poor video quality, frequently froze and disconnected, and was not an effective means of communication for Plaintiff. Plaintiff was not provided any other interpretive services during this visit.

**November 1, November 7, and November 10, 2021**

75.     On or about November 1, 2021, Plaintiff's husband returned to the Hospital for issues relating to his heart.

76.     On or about November 7, 2021, Plaintiff's husband was brought to the Hospital by ambulance for issues relating to his blood pressure.

77.     On or about November 10, 2021, Plaintiff's husband returned to the Hospital for issues relating to his blood pressure.

78.     During each of these visits, Plaintiff accompanied her husband.

79.     As with almost all of Mr. and Mrs. McKague's previous visits, the Hospital attempted to communicate with Plaintiff through VRI that did not work, had poor video quality,

frequently froze and disconnected, and was not an effective means of communication for Plaintiff. Plaintiff was not provided any other interpretive services during these visits.

**Facts relevant to all visits**

80.    During the visits discussed above that took place after February 2020, Plaintiff's inability to effectively communicate without ASL interpretation was exacerbated by the fact that Hospital staff were wearing facemasks due to the COVID-19 pandemic, which prevented Plaintiff from even attempting to read lips or see staff's facial expressions.

81.    Upon information and belief, Defendants and their employees follow the recommendations and regulations of the Joint Commission.

82.    Upon information and belief, Defendants follow the recommendations for effective communication in the Joint Commission's Advancing Effective Communication, Cultural Competence, and Patient- and Family-Centered Care: A Roadmap for Hospitals, https://www.jointcommission.org/-/media/tjc/documents/resources/patient-safety-topics/health-equity/aroadmapforhospitalsfinalversion727pdf.pdf?db=web&hash=AC3AC4BED1D973713C2 CA6B2E5ACD01B&hash=AC3AC4BED1D973713C2CA6B2E5ACD01B.

83.    Consistent with the Joint Commission's guidance, Defendants have a responsibility to "develop a system to provide language services to address the communication needs of patients whose preferred language is not English, including patients who communicate through sign language." *Id*. at page 40.

84.    Defendants have a responsibility to identify a "patient's preferred language for discussing health care." *Id*. at page 10.

85.    If necessary to determine a patient's preferred language, Defendants should "[a]rrange for language services to help identify the patient's preferred language," and once the

preferred language is identified, Defendants should "[n]ote the patient's preferred language for health care discussions in the medical record and communicate this information to staff." *Id*.

86.    The Joint Commission requires hospitals like Defendants to "[p]rovide an interpreter for the patient's preferred language during informed consent discussions, even if the hospital provides translated materials, to facilitate patient communication." *Id*. at page 20.

87.    As advised by the Joint Commission, Defendants are aware that "[e]xchanging written notes . . . will likely be effective communication for brief and relatively simple face-to-face conversations." *Id*. at page 69.

88.    Similarly, Defendants are aware that "[w]ritten forms or information sheets may provide effective communication in situations with little call for interactive communication, such as providing billing and insurance information or filling out admission forms and medical history inquiries." *Id.* at page 69.

89.    Defendants and their staff knew that Plaintiff is deaf and that Plaintiff made repeated requests for interpreters at her visits.

90.    Defendants' discrimination against Plaintiff, and Plaintiff's resulting lack of understanding as to her care, caused Plaintiff to suffer humiliation, anger, frustration, stress, anxiety, and emotional distress. This is particularly true where Plaintiff sought urgent treatment for her mental health but instead spent two days in a psychiatric ward, unable to communicate because of Defendants' failure to provide her with ASL interpreters or functioning VRI.

91.    Defendants also knew or should have known of their obligations as health care providers under the ACA to develop policies and promote compliance with these statutes and to provide reasonable accommodations, including but not limited to the provision of ASL interpreters to ensure effective communication with deaf persons.

92.    Defendants and their staff knew or should have known that their actions and/or inactions created an unreasonable risk of causing Plaintiff greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a hearing person would be expected to experience.

93.    Nonetheless, Defendants prevented Plaintiff from fully benefitting from their services by failing to provide the ASL interpreters necessary for her full participation in and understanding of her and her husband's care.

94.    In doing so, Defendants intentionally discriminated against Plaintiff and acted with deliberate indifference to her federally protected rights. By repeatedly failing to accommodate Plaintiff over the years despite knowing that she is deaf, primarily uses ASL to communicate, and has requested ASL interpreters to meaningfully participate in and understand her and her husband's care, Defendants knew that harm to a federally protected right was substantially likely and have failed to act on that likelihood to date.

95.    This is especially true where Defendants' staff have conceded in Plaintiff's medical records that the Hospital's VRI device does not function properly, but still either attempt to use the device to communicate with Plaintiff or provide no interpretive services whatsoever at subsequent visits to the Hospital.

96.    The Hospital's failure to provide Plaintiff with functioning VRI, in-person interpreters, or another equally effective alternative means of communication over more than four years of frequent visits to the Hospital, despite knowledge of pervasive and systemic problems with its VRI devices, demonstrates a pattern and practice of deliberate indifference to Plaintiff's communication needs and to the needs of other deaf patients.

97.    Defendants' wrongful and intentional discrimination against Plaintiff on the basis of her disability is also reflected by Defendants' failure to train employees and promulgate policies

of non-discrimination against deaf individuals.

98.   As a result of Defendants' failure to ensure effective communication with Plaintiff, Plaintiff received services that were objectively substandard and that were inferior to those provided to patients who are hearing.

99.   Plaintiff is entitled to equal access to services offered by Defendants as are enjoyed by non-disabled persons.

100.   Defendants' Hospital is the only hospital with an emergency room in the city of Danville, VA.  Any alternative hospital is a substantial distance away, and the next closest hospital to Plaintiff's residence with an emergency room is SOVAH Health – Martinsville, which is also owned and operated by Defendants and their parent companies/affiliates. As such, residents of Danville have little choice but to visit the Hospital in the case of a medical emergency. Because Plaintiff and her husband reside in Danville, VA, she definitively expects and plans to receive medical care or accompany her husband to receive medical care at Defendants' Hospital again in the future.

101.   Indeed, as outlined above, Plaintiff frequently visits the Hospital numerous times each year for a variety of health concerns relating to herself and her husband. Despite that Defendants' consistent discrimination against her on the basis of her disability deters her from doing so, Plaintiff intends to continue visiting the Hospital given (1) the lack of alternative hospital emergency rooms in her area and (2) the fact that the Hospital has access to and knowledge of her and her husband's extensive medical records and issues. Given the Hospital's repeated and consistent failure to comply with federal antidiscrimination laws, there is a real and immediate threat that Plaintiff will suffer further discrimination by the Hospital in the near future.

**CAUSES OF ACTION**

**COUNT I: Violations of Section 1557 of the Patient Protection and Affordable Care Act**

102.    Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

103.    At all times relevant to this action, the ACA has been in full force and effect and has applied to Defendants' conduct.

104.    At all times relevant to this action, Plaintiff has had substantial limitations to the major life activities of hearing and speaking and has been an individual with a disability within the meaning of the ACA, 42 U.S.C. § 18116.

105.    At all times relevant to this action, Defendants received federal financial assistance, including Medicare and Medicaid reimbursements, and have been principally engaged in the business of providing health care.  Thus, Defendants are a health program or activity receiving federal financial assistance under 42 U.S.C. § 18116(a).

106.    Under the ACA, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. § 18116.

107.    Federal regulations implementing the ACA provide that a covered entity "shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in such programs or activities, in accordance with the standards found at 28 CFR 35.160 through 35.164." 45 C.F.R. § 92.102(a).

108.    Accordingly, federal regulations implementing the ACA also provide that a "[covered] entity shall furnish appropriate auxiliary aids and services when necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the

public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity. . . . In determining what types of auxiliary aids and services are necessary, a [covered] entity shall give primary consideration to the requests of individuals with disabilities.  In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.  28 C.F.R. § 35.160(b), *cited by* 45 C.F.R. § 92.102(a).

109.    Federal regulations implementing the ACA further require that a covered entity that provides individuals with disabilities "qualified interpreters via VRI services shall ensure that it provides–(1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position; (3) A clear, audible transmission of voices; and (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI." 28 C.F.R. § 35.160 (*cited by* 28 C.F.R. §§ 35.104 & 36.303(f); in turn *cited by* 45 C.F.R. § 92.102(b)(1)(i)).

110.    A VRI system that does not meet all of these standards is not an "effective method[] of making aurally delivered materials available to individuals with hearing impairments"— meaning a non-compliant VRI system does not count as an auxiliary aid or service. 42 U.S.C. § 12103(1)(A); 28 C.F.R. § 36.104; 28 C.F.R. Pt. 36 App. A ("[T]he Department has established performance standards for VRI in § 36.303(f). The Department recognizes that reliance on VRI may not be effective in certain situations, such as those involving the exchange of complex

information or involving multiple parties . . . and using VRI in those circumstances would not satisfy a public accommodation's obligation to provide effective communication.").

111.    At all times relevant to this action, Plaintiff's primary language for communication has been ASL, and she has a limited ability to read, write, speak, or understand English. Plaintiff is thus also an individual with limited English proficiency within the meaning of the ACA.

112.    Indeed, the ACA regulations governing individuals with disabilities and individuals with limited English proficiency contain virtually identical definitions, prohibitions, and requirements. For example, compare 45 C.F.R. § 92.102(b)(2)(i)–(iii) regarding the provision of interpreters to individuals with disabilities:

> When an entity is required to provide an interpreter . . . the interpreting service shall be provided to individuals free of charge and in a timely manner, via a remote interpreting service or an onsite appearance, by an interpreter who
>
> (i)    Adheres to generally accepted interpreter ethics principles, including client confidentiality; and
>
> (ii)    Is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary, terminology and phraseology;

with 45 C.F.R. § 92.101(b)(3)(i)(A)–(C) regarding the provision of interpreters to those with limited English proficiency:

> [Interpreter services] must be provided by an interpreter who:
>
> (A)    Adheres to generally accepted interpreter ethics principles, including client confidentiality;
>
> (B)    Has demonstrated proficiency in speaking and understanding at least spoken English and the spoken language in need of interpretation; and
>
> (C)    Is able to interpret effectively, accurately, and impartially, both receptively and expressly, to and from such language(s)

and English, using any necessary specialized vocabulary, terminology and phraseology.

113.    During Plaintiff's and her husband's visits to the Hospital prior to August 2020, federal regulations implementing the ACA provided that (1) a "covered entity shall offer a qualified interpreter to an individual with limited English proficiency when oral interpretation is a reasonable step to provide meaningful access for that individual with limited English proficiency" and (2) a "covered entity shall use a qualified translator when translating written content in paper or electronic form."  45 C.F.R. § 92.201(d)(1)–(2).

114.    Since August 2020, federal regulations implementing the ACA similarly provide that a covered entity "shall take reasonable steps to ensure meaningful access to such programs or activities by limited English proficient individuals," 45 C.F.R. § 92.101(a), and that where an individual "requires the provision of language assistance services, such services must be provided free of charge, be accurate and timely, and protect the privacy and independence of the individual with limited English proficiency. Language assistance services may include: (i) Oral language assistance, including interpretation in non-English languages provided in-person or remotely by a qualified interpreter for an individual with limited English proficiency, and the use of qualified bilingual or multilingual staff to communicate directly with individuals with limited English proficiency; and (ii) Written translation, performed by a qualified translator, of written content in paper or electronic form into languages other than English." 45 C.F.R. § 92.101(b)(2)(i)–( iv).

115.    As set forth above, Defendants discriminated against Plaintiff on the basis of her disability in violation of the ACA and its implementing regulations.

116.    The ACA, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to Plaintiff–that is, "any person aggrieved" by discrimination in violation of the Rehabilitation Act.  42 U.S.C. § 18116(a).

117.    Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the ACA.

118.    Plaintiff seeks injunctive relief, nominal and compensatory damages, and attorneys' fees and costs for the injuries and loss she sustained as a result of Defendants' discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Deborah McKague respectfully requests that this Court:

A.    Enter a declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of Section 1557 of the Patient Protection and Affordable Care Act;

B.    Issue an injunction forbidding Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf individuals or their companions meaningful access to, and full and equal enjoyment of, Defendants' facilities, services, or programs;

C.    Issue an injunction ordering Defendants to:

   i.   develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an in-person or VRI interpreter for effective communication, when other means are not effective one will be provided as soon as practicable in all services offered by Defendants;

   ii.  develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf and hard of hearing of their right to effective communication; including posting explicit and clearly marked and worded notices that Defendants will provide sign language interpreters upon request to ensure effective communication with deaf or hard of hearing persons;

    iii.    develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most appropriate method under the circumstances;

    iv.    create and maintain a list of sign language interpreters and ensure availability of such interpreters at any time of day or night;

    v.    train all employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ACA;

D.  Award to Plaintiff:

    i.    Compensatory damages;

    ii.    Nominal damages;

    iii.    Reasonable costs and attorneys' fees;

    iv.    Interest on all amounts at the highest rates and earliest dates allowed by law; and

    v.    Any and all other relief that this Court deems just and appropriate.

Dated: March 24, 2022

Respectfully submitted,

By: _____

Andrew Rozynski (seeking *pro hac vice)*
Eisenberg & Baum, LLP
24 Union Square East, PH
New York, NY 10003
Phone: (212) 353-8700
Fax: (917) 591-2875
ARozynski@eandblaw.com

By: <s>   Zachary S. DeVore_____

Zachary S. Devore, VSB#65401
Steven M. Traubert, VSB#41128
Disability Law Center of Virginia
1512 Willow Lawn Drive, Suite 100

Richmond, VA 23230
Phone: (804) 225-2042
Fax: (804) 662-7431
Zachary.devore@dlcv.org
Steven.Trauber@dlcv.org

*Attorneys for Plaintiff*